10 CIV 4380

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

RECEIVED
JUN 02 2010
U.S.D.C. S.D. N.Y.
CASHIERS

| | |
|---|---|
| EUN-JA SON and SANG-IK HAN, On Behalf of Themselves and All Others Similarly Situated, | CASE NO. _____ |
| Plaintiffs, | **CLASS ACTION** |
| | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| LG DISPLAY CO., LTD. (f/k/a LG PHILIPS LCD CO., LTD.), YOUNG SOO KWON, BON JOON KOO, and RON H. WIRAHADIRAKSA, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiffs, EUN-JA SON and SANG-IK HAN (the "Plaintiffs") (who are residents of the Republic of Korea), on behalf of themselves and all other persons and entities similarly situated by their undersigned attorneys, allege the following upon their individual and personal knowledge as to themselves and their own acts, and the investigation undertaken by Plaintiffs' counsel as to all other matters, which includes, *inter alia*, an analysis of publicly available documents published or disseminated by, on behalf of, or concerning LG Display Co., LTD. (f/k/a LG PHILIPS LCD CO., LTD.) ("LG", "LG Display" or the "Company"), and/or any of its competitors or peers, and any of the Individual Defendants named herein, including, *inter alia*, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases and other announcements, transcripts or wire broadcasts of conference calls, securities analysts' reports and advisories about LG, and information readily available on the internet, as well as a review of civil and criminal pleadings filed in connection with LG's illegal antitrust activities. Plaintiffs

believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## PRELIMINARY STATEMENT

1.     This is a class action brought by the Plaintiffs on behalf of themselves and all others who purchased or otherwise acquired the securities of LG on the Korea Stock Exchange ("KSE") during the period from July 16, 2004 to November 13, 2008, inclusive (the "Class Period").  Plaintiffs bring this action pursuant to §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5, promulgated thereunder, 17 C.F.R. §240.10b-5.  LG's shares are listed on both the KSE and the New York Stock Exchange ("NYSE").

2.     Currently pending in the United Stated District Court for the Southern District of New York is the action entitled *In re L.G. Philips LCD Co., Ltd. Sec. Litig.*, Civil Action No.: 1:07-CV-00909-RJS, which is brought "on behalf of purchasers of LG Philips' publicly traded securities, including American Depository Shares ("ADSs"), during the period from July 16, 2004 to December 11, 2006."  Plaintiffs herein allege that materially false and misleading statements continued to be issued through November 13, 2008.  The vast majority of LG securities, in particular shares of its common stock, were traded on the KSE.

3.     LG is a corporate entity that engages in the manufacture and supply of thin film transistor liquid crystal display ("LCD") panels to original equipment manufacturers and multinational corporations, primarily for use in notebook computers, desktop monitors, televisions and industrial and other applications.  LG is one of the largest suppliers of high-definition television panels to the market.  On or around March 2008, LG changed its name from LG Philips LCD Co. Ltd. to LG Display Co., Ltd.

4.      During the Class Period, Defendants made a series of materially false and misleading statements concerning LG's business affairs, how it was able to post historic profits, and the likelihood that it would be exposed to a massive criminal fine.

5.      Defendants issued numerous statements materially misrepresenting LG's prospects in the LCD business and the ongoing investigations of LG's anticompetitive practices. Until the end of the Class Period, Defendants failed to disclose that they had been using deceptive antitrust mechanisms to artificially inflate LG's earnings and profit margins.  LG eventually pled guilty for its illegal price-fixing activities and received the second largest criminal fine in U.S. Department of Justice ("DOJ") history on November 12, 2008 (or November 13, 2008 in the Korean Time Zone).

6.      Defendants commenced their market stabilization goal on or about September 21, 2001.  Defendants never disclosed that their ensuing success was the result of their engagement in a conspiracy to suppress and eliminate competition, and to fix prices, in the LCD market.

7.      Throughout fiscal year 2004, the Defendants' positive claims all shared the common theme that LCD prices would stabilize in the near future and that, as a result, LCD product demand would show a corresponding increase.  The Defendants failed to disclose that LG's anticompetitive activities were actually creating the stabilized market.  Throughout fiscal year 2005, the Defendants continued to issue positive statements and representations concerning the LCD market and the Company's financial results, while failing to disclose that their participation in an unlawful price-fixing scheme was behind LG's prosperity in the LCD market.

8.      By early 2006, Defendants began to phase-out their price-fixing activities.  As the scheme dissolved, inflated LCD prices began to fall, as did LG's profits.  LG would soon be forced to abandon its mechanism for producing artificially high profits.  However, the

Defendants were still able to materially mislead investors and analysts by denying LG's role in the price-fixing scheme and the likelihood that LG and several of its senior executives would be subject to a massive criminal fine.

9.      On December 8, 2006, officials from South Korea's Fair Trade Commission appeared at LG's Seoul headquarters to proceed with a formal investigation of the Company and its top executives.  LG's units in San Jose, California and Tokyo, Japan were investigated as well by, respectively, the U.S. DOJ and the Japanese Fair Trade Commission.

10.      On December 11, 2006, LG announced that it was being investigated for "possible anticompetitive conduct in the LCD industry."  The Defendants' anticompetitive behavior prompted investigations by the U.S. DOJ, the European Commission, the Korean Fair Trade Commission, and the Japanese Fair Trade Commission.  Additionally, Samsung Electronics and Sharp Corporation reported that they were under similar investigation by antitrust authorities.  The announcements concerning the various investigations led to a stock decline that erased billions of dollars in market value from the top five LCD producers.

11.      On December 12, 2006, news sources, including AFP News, reported that "[b]oth Samsung and LG Philips deny they have been involved in any price rigging."  An official of LG Philips stated to ETNEWS, in a Korean News article (as translated to English), that ". . . . LG Philips has not done any anti-competitive activities, therefore, it shall fully cooperate with the investigation of the authorities . . . ."  Ms. Cho Sung In, a spokeswoman of Samsung Electronics, told reporters that "Samsung is strongly committed to fair competition and ethical practices and forbids anticompetitive behavior."  A spokeswoman of Sharp Corporation, Ms. Miyuki Nakayama, stated that the company was surprised to have received the summons and added that Sharp has a policy of "fair and ethical management."

12.     From the KFTC raid on December 8, 2006 to the end of the Class Period, the Defendants continued to issue materially false and/or misleading statements concerning their role in the price-fixing scheme and their exposure to a massive criminal fine.  The Defendants issued positive statements concerning, among other things, LG's cost competitiveness and strategic initiatives, but failed to disclose any material information concerning the ongoing investigations and that LG would have to take responsibility for its anticompetitive activities and pay a staggering criminal fine.

13.     On November 12, 2008, the U.S. DOJ announced that LG had agreed to plead guilty and pay criminal fines totaling $400 million, which was "the second highest criminal fine ever imposed by the Department's Antitrust Division," for its participation "in a conspiracy from September 21, 2001 to June 1, 2006 to fix the price of TFT-LCD panels sold worldwide."

14.     Statements issued by the Defendants during the Class Period were materially false and misleading because they failed to disclose and/or misrepresented the following adverse facts:

(a)     From on or about September 21, 2001 to on or about June 1, 2006, LG and its co-conspirators engaged in a price-fixing scheme in order to suppress and eliminate competition in the LCD panel industry in unreasonable restraint of interstate and foreign trade and commerce.  The price-fixing scheme consisted of an ongoing agreement, understanding, and concert of action among LG and its co-conspirators.  The purpose of the scheme was to fix the prices of LCD panel products;

(b)     In order to carry out the scheme, LG and its co-conspirators participated in meetings, including group meetings commonly referred to by the participants as "crystal meetings," conversations and communications in the U.S., Taiwan and Korea to agree to charge prices for LCD panel products at certain levels to be sold to certain resellers and consumers.  The

5

scheme involved issuing price quotations, as well as exchanging information on sales of LCD panel products;

        (c)      the Company was reporting inflated revenues, profit margins and financial results that did not reflect its true business, but rather the results of the price-fixing scheme;

        (d)      LG's Class Period financial strength and cost competitiveness was the result of its participation in the price-fixing conspiracy; and

        (e)      Even after the announced raid by the KFTC of LG's headquarters on or about December 8, 2006 and through November 12, 2008, Defendants misled investors worldwide by touting its financial strength, cost savings, business structure, competitive advantages and strategic initiatives, while denying involvement in the price-fixing scheme and failing to disclose the strong likelihood that LG and a number of its senior executives would be forced to plead guilty to the antitrust conspiracy which had allowed it to inflate its profits and share price, and which ultimately resulted in the payment of a historic criminal fine of $400 million.

        15.    As a result of the foregoing, LG's securities traded at artificially inflated prices on both the KSE and NYSE. This enabled LG to raise billions of dollars in several public offerings, including approximately $1 billion in its July 2004 initial public offering ("2004 IPO") and approximately $1.5 billion in its July 2005 secondary offering (the "2005 Secondary Offering"), simultaneously from investors in both the U.S. and Korea.

        16.    Numerous antitrust actions concerning the instant scheme have been commenced on behalf of private direct and indirect purchasers, consolidated in *In re: TFT-LCD (Flat Panel) Antitrust Litigation*, Master File No. C07-1827 SI (N.D. Cal., filed Nov. 5, 2007), which further evidence LG's engagement in undisclosed anticompetitive conduct, both in the United States and

abroad, that accounted for the Company's inflated earnings.

## JURISDICTION AND VENUE

17.     The claims alleged herein arise under §§10(b) and 20(a) of the Exchange Act (15

U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder.

18.     This Court has jurisdiction over the subject matter of this action pursuant to §27

of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §§1331 and 1337.

19.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28

U.S.C. §1391(b).   Many of the acts alleged herein, and the acts giving rise to Defendants'

misconduct, occurred in substantial part in this District.   Defendant LG accessed the U.S. capital

markets through its contacts with its New York based investment bankers, including Morgan

Stanley, Citigroup and UBS Investment Bank.   The Company directed the New York investment

bankers to distribute shares from this District in connection with its Offerings and listed its ADSs

on the NYSE.

20.     In connection with the acts, transactions and conduct, alleged herein, Defendants,

directly or indirectly, used the means and instrumentalities of interstate commerce, including, but

not limited to, the mails, interstate telephone communications and the facilities of the national

securities markets.

## THE PARTIES

21.     Plaintiffs purchased securities of the Company during the Class Period, as

detailed in their certifications incorporated herein, and were damaged thereby.

22.     Defendant LG Display is headquartered in Seoul, South Korea and engages in the

manufacture and supply of LCDs to original equipment manufacturers and multinational

corporations.   On or about March 2008, the Company changed its name to LG Display Co., Ltd.

During the Class Period, LG Display America, Inc. (formerly known as LG Philips LCD America, Inc.) operated as a wholly-owned subsidiary of LG. At all relevant times, LG Display America was engaged in the sale of TFT-LCD to customers in the U.S. LG Display America was founded in 1999 and is based in San Jose, California. LG Display America is a corporation organized and existing under the laws of the State of California.

23.    Defendant Young Soo Kwon ("Kwon") has been serving as the Company's Representative Director, President and Chief Executive Officer since February 28, 2007. Kwon participated in drafting the Company's press releases during the Class Period.

24.    Defendant Bon Joon Koo ("Koo") served from 2004 until February 27, 2007 as the Company's Joint Representative Director, Vice Chairman and Chief Executive Officer. Koo participated in drafting the Company's press releases during the Class Period, as well as certain of the Company's offering documents, including those related to the Company's 2004 IPO and the 2005 Secondary Offering.

25.    Defendant Ron H. Wirahadiraksa ("Wirahadiraksa") was appointed the Company's Chief Financial Officer and Senior Executive Vice President, and as a Representative Director, in August 1999. He has also served as the Company's President. Upon information and belief, he resigned as the Company's President and CFO on or about February 2008. Wirahadiraksa participated in drafting the Company's press releases during the Class Period, as well as certain of the Company's offering documents, including those related to the Company's 2004 IPO and the 2005 Secondary Offering.

26.    The Defendants identified above in ¶¶ 23-25 are sometimes referred to herein as the "Individual Defendants."

27.    According to the Company's 2004 and 2005 Annual Reports, the Board of

Directors, which included Defendants Koo and Wirahadiraksa, had the ultimate responsibility for the management of the Company's business affairs.

28.    The Individual Defendants, by virtue of their high-level positions within the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, prospects, growth, finances and financial condition, as alleged herein.

29.    The Individual Defendants were involved in drafting, producing, reviewing, approving and/or disseminating the materially false and misleading statements and information alleged herein, were aware of or recklessly disregarded the fact that materially false and misleading statements were being issued regarding the Company, and approved or ratified these statements in violation of securities laws.

30.    As officers and controlling persons of a publicly-held company whose securities traded on the KSE as well as ADSs that were, and are registered with the SEC pursuant to the Exchange Act, and are traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition business affairs and likelihood of receiving a massive criminal fine and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information.

31.    The Individual Defendants, by virtue of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other widely distributed statements pertaining to LG during the

Class Period.

## SUBSTANTIVE ALLEGATIONS

32.     During the Class Period, the market for LCDs grew dramatically.  In 2006, the worldwide market for TFT-LCD panels was approximately $70 billion.

33.     The LCD industry is heavily concentrated among five companies: LG, Samsung, Sharp, AU Optronics and Chi Mei.  Any collusive conduct among these companies was easily manageable.  The LCD industry also has very high barriers to entry due to very high production costs as technology advances.

34.     The Company's involvement in the LCD panel price-fixing began on or about September 21, 2001.  In formulating and effectuating the price-fixing arrangement, the Company and its co-conspirators agreed to charge prices at certain levels and to otherwise fix, increase, maintain or stabilize prices of LCD products sold in the U.S.  The price-fixing scheme enabled LG to inflate its revenues and profit margins, and to artificially increase the price of the Company's securities on the KSE and NYSE.

35.     During the Class Period, LG's executives attended conferences with other LCD companies' executives where presentations were made about controlling supply and demand. LG executives participated in "meetings, conversations, and communications in Taiwan, Korea, and the United States . . . ."  As the U.S. DOJ revealed during its November 12, 2008 press conference, "from 2001 until into 2006, LG Display, LG Display America and CPT and their co-conspirators participated in group meetings commonly referred to by the participants as crystal meetings.  At these crystal meetings and during other discussions, representatives of the major LCD suppliers, including LG Display and CPT agreed to charge certain prices for standard-sized LCD panels used in computer monitors, laptops and TVs to purchasers of LCDs throughout the

world, including purchasers in the U.S."

36.     Market research firms provided the Company and its co-conspirators with monthly data on market activity, which included data provided to these firms by LG and its co-conspirators, enabling the Company to monitor market information and signal its intentions to its co-conspirators in furtherance of the scheme.

37.     During the Class Period, the Defendants concealed this unlawful conduct from Plaintiffs and the Class.  Instead, the Defendants falsely maintained, among other things, that the Company was benefitting from price stabilization and increased LCD product demand.

38.     On or about December 11, 2006, it was disclosed via news services that the Company was under investigation by the DOJ for conspiring to fix the prices of LCD panel products.  However, the Company denied the price-fixing allegations and its participation in the scheme was not fully revealed until November 12, 2008, when the DOJ announced that the Company agreed to plead guilty for its role in the price-fixing conspiracy.

## FALSE AND MISLEADING STATEMENTS MADE DURING THE CLASS PERIOD

39.     On July 16, 2004, LG filed a prospectus for the Initial Public Offering of 33.6 million primary shares priced at $15 per share, with 24.96 million shares sold as ADSs and the balance sold as common stock in Korea.  The IPO was made pursuant to a Registration Statement filed with the SEC on a Form F-1 on June 24, 2004 and amended on July 16, 2004 on Form POSAM and a Prospectus (dated July 15, 2004) that was filed with the SEC on Form 424B4 on July 16, 2004 (the "IPO Prospectus").  Regarding the Company's cost competitiveness, the IPO Prospectus contained numerous representations, including that:

> We believe that our technology leadership enables us to make timely
> investments in advanced manufacturing facilities and process technology
> improvements which in turn positions us to deliver a broad and advanced

product portfolio in high volumes and in a cost competitive manner to our customers.

* * *

The advanced nature and scale of our facilities is a key driver of our cost competitiveness.

* * *

We plan to continue focusing on our product and manufacturing technology in order to maintain our position as an industry leader in delivering a broad and advanced product portfolio in high volumes and in a cost competitive manner.

40.    Concerning risks relating to LG's industry, the IPO Prospectus stated, in relevant part, as follows:

We operate in a highly competitive environment and we may not be able sustain our current market position.

* * *

Our industry is subject to cyclical fluctuations, including recurring periods of capacity increases, that may adversely affect our operating results.

* * *

We may experience declines in the average selling prices of our display panels irrespective of cyclical fluctuations in the industry.

* * *

Our operating results fluctuate from period to period, so you should not rely on period-to-period comparisons to predict our future performance.

41.    Statements issued by the Defendants in the 2004 IPO Prospectus were materially false and/or misleading for the reasons set forth in ¶14 and because they failed to disclose and misrepresented that LG had entered into and engaged in a combination and conspiracy in the U.S. and elsewhere to suppress and eliminate competition by fixing the prices of LCD panel products.  This unlawful conduct consisted of a continuing agreement, understanding, and

concert of action among LG and its co-conspirator for the purpose of forming and carrying out the charged combination and conspiracy. The Company's financial results and competitiveness were the result of its participation in the price-fixing conspiracy which spurred the Company's shares to trade at inflated prices, enabling the Company to raise billions of dollars through various offerings.

42.     On October 11, 2004, LG announced, via press release, its third quarter results, reporting its unaudited earnings results based on consolidated Korean Generally Accepted Accounting Principles ("GAAP") for the three-month and nine-month periods ended September 30, 2004. Concerning pricing pressure, the press release stated, in relevant part, as follows:

> Sales in the third quarter declined 19.6% compared to the second quarter of 2004 due to pricing pressure as a result of increased capacity in the industry, which stemmed in part from the easing of industry-wide shortages of materials and a build-up of inventory.

43.     Commenting on LG's performance, defendant Koo stated, in relevant part, as follows:

> In our first quarter as a public company, we continue to experience year-on-year revenue growth, as we utilized our increased capacity to generate higher sales to our global merchant customers.

44.     Concerning the Company's third quarter financial review, the press release stated, in relevant part, as follows:

> Increases in capacity contributed to additional unit sales of large-size panels for notebook computers, desktop monitors and TVs in the three-month period ended September 30, 2004, compared to the corresponding period in 2003. TFT-LCD panels for desktop monitors accounted for 54.5% in terms of revenue, with notebook computers accounting for 26.5%, TVs accounting for 13.5% and applications accounting for 5.4%.

45.     Concerning LG's performance and position to capture market share, defendant Wirahadiraksa stated, in relevant part, as follows:

While we experienced greater than expected pricing declines during the quarter, we believe these declines should lead to increased acceptance and sales in the global TV market. Furthermore, we believe that LG Philips LCD is well positioned to capture market share and to grow our customer relationships.

46.    Regarding LG's outlook and LCD prices, the press release stated, in relevant part, as follows:

The TFT-LCD industry should experience both unit and area growth in the fourth quarter of 2004 and during 2005.

LG Philips LCD will increase its output to meet this growth and to meet its customers' needs.

We expect prices to further stabilize, as they currently are, in Q4 2004. Prices in the first half of 2005 are expected to remain weak for both PC computers and TVs and to improve in the second half of 2005, mainly due to growing demand for LCD TVs.

47.    The statements in the October 11, 2004 press release referenced above were materially false and/or misleading for the reasons previously set forth in ¶¶ 14 and 41.

48.    On January 24, 2005, LG announced, via press release, its fourth quarter 2004 results, reporting its unaudited earnings results based on consolidated Korean GAAP for the three-month and full year-periods ended December 31, 2004.  LG stated, in relevant part, as follows:

Sales decreased by 9% in the fourth quarter of 2004 from KRW 2,135 billion (USD 2,063 million) in the fourth quarter of 2003 due to decreases in panel prices. Fourth quarter 2004 sales comparisons from both a sequential and year-on-year perspective, were also impacted by the Korean Won appreciation against the US dollar during this period. Revenues for 2004 were KRW 8,328 billion (USD 8,046 million), an increase of 37% from KRW 6,098 billion (USD 5,891 million) in 2003.

49.    Commenting on the Company's performance, defendant Koo, stated in relevant part, as follows:

We continue making steady gains towards our goal of becoming the

14

number one LCD company in the industry.

*     *     *

Our advanced technology enables us to further enhance our product offerings, strengthen our market position and fortify our strategic relationships with key customers.

50.     Commenting on LG's performance and outlook, defendant Wirahadiraksa stated, in relevant part, as follows:

As we announced in December 2004, price declines in the fourth quarter were greater than we anticipated earlier in that period. Yet, despite these conditions, LG Philips LCD continued to execute well on its plan to sustain market leadership, manufacturing efficiencies and sound financial management.

Our strength and commitment to state-of-the-art manufacturing resulted in an impressive 38% increase in area shipped for the quarter, while at the same time, we were able to reduce our costs of goods sold. In 2005, we believe there will be strong growth in consumer demand for flat screen TVs, and our focus remains the same: superior execution, prudent cost-cutting measures and investing in our business to further improve our competitive position and long-term growth prospects.

*     *     *

We expect the industry supply/demand balance will begin to stabilize in the second quarter and then show signs of strengthening later in the year. For the first quarter of 2005, we see our area shipments increasing approximately 9% quarter-on-quarter. We expect a high single digit rate decline on the ASP per net display area shipped at the end of the first quarter of 2005 as compared to the end of the fourth quarter of 2004. As a result, we expect our EBITDA margin rate in the first quarter of 2005 to be in the range of the mid-teens.

51.     Regarding LG's outlook, the press release stated, in relevant part, as follows:

According to *DisplaySearch*, the TFT-LCD industry should experience both unit and area growth in 2005. LG Philips LCD plans to increase its output to meet this anticipated growth and to meet its customers' needs.

52.     The statements in the January 24, 2005 press release referenced above were materially false and/or misleading for the reasons set forth in ¶¶ 14 and 41.

15

53.     On April 11, 2005, the Company announced via press release its first quarter 2005 results, reporting its unaudited earnings results based on consolidated Korean GAAP for the three-month period ended March 31, 2005.  The press release stated, in relevant part, as follows:

> Sales decreased by 6% in the first quarter of 2005 from KRW 2,188 billion (USD 2,155 million) in the first quarter of 2004 due to decreases in panel prices.

54.     Commenting on the Company's performance and growth, defendant Koo stated, in relevant part, that:

> Despite challenging market conditions, we continue to execute and perform in line with our plans.  As a result of our ongoing, strong ramp-up of our sixth generation factory, 'P6', we grew our total net display area shipped by 24 percent in the first quarter sequentially.
>
> \*       \*       \*
>
> We continue to believe in the growth opportunities for the TFT-LCD industry, as LCDs evolve as the flat-panel of choice for HDTV content.

55.     Regarding LG's first quarter financial review, the press release stated, in relevant part, that:

> The effect of the overall decrease in panel prices was partially offset by an increase in the volume of large and wide panels for notebook computers, desktop monitors and TVs.  The increase in volume shipments was in response to the growing market needs for large and wide flat panels, especially for large size TV panels.

56.     Commenting on LG's performance, defendant Wirahadiraksa, stated, in relevant part, that:

> While the first quarter was challenging due to the strengthening of the Korean Won and a difficult pricing environment, we did see some positive emerging trends.
>
> \*       \*       \*
>
> To meet the increase in demand, we continue to focus on effectively using our resources to serve our customers and improve operational efficiency.

\* \* \*

> As we have previously stated, we expect the industry supply/demand balance will begin to stabilize and then show signs of strengthening later in the year, mainly due to the growing demand for LCD TVs.

57.    Concerning LG's outlook, the press release stated, in relevant part, as follows:

> LG Philips LCD expects to increase its output of net display area shipped at a double digit rate for the second quarter of 2005, compared to the first quarter of 2005, in order to meet the anticipated market growth and to satisfy customers' needs.   At the same time, due to market pricing conditions, the Company expects its ASP per square meter to decline at a single digit rate at the end of the second quarter of 2005, compared to the end of the first quarter in 2005.

58.    The statements in the April 11, 2005 press release referenced above were materially false and/or misleading for the reasons set forth in ¶¶ 14 and 41.

59.    On July 11, 2005, the Company announced via press release its second quarter 2005 results, reporting its unaudited earnings results based on consolidated Korean GAAP for the three-month period ended June 30, 2005.  The press release stated, in relevant part, that:

> Second quarter 2005 sales were led by increased shipments of large and wide LCD TV panels, desktop monitor panels, and notebook panels.

60.    Commenting on the Company's performance, defendant Koo, stated, in relevant part, that:

> In this dynamically expanding industry, LG Philips LCD continues to be the number one provider of large TFT-LCD panels, with a large panel revenue market share of 24.2% in the second quarter according to *DisplaySearch*.  In the second quarter, we were encouraged by the growth in shipments of LCD TV panels and remain committed to executing our leadership strategy.

61.    Concerning LG's second quarter financial review, the press release stated, in relevant part, that:

> Revenues in the three-month period ended June 30, 2005 decreased by 1.0% to KRW 2,308 billion (USD 2,231 million) from KRW 2,332 billion

(USD 2,254 million) in the corresponding period in 2004, as increases in shipments mostly offset the effect of decreases in panel prices.

62.     Regarding LG's performance and outlook, defendant Wirahadiraksa stated, in relevant part, as follows:

> In the second quarter we experienced increased demand for monitor and LCD TV panels. In anticipation of this demand, we continued the successful ramp-up of our P6 facility.

*     *     *

> We have already taken a leading position in this segment and we expect to further strengthen our market position in the second half of 2005 as demand grows.

*     *     *

> We expect the business environment to continue strengthening in the second half of 2005. For the third quarter of 2005, we believe our area shipments will increase by a mid teen percentage quarter-on-quarter due to continued growth in the monitor and TV segments. We expect a single digit percentage increase in our average sales price per square meter of net display area shipped at the end of the third quarter of 2005 as compared to the end of the second quarter of 2005. We continue to lead the TFT-LCD market expansion and remain well positioned with the ramp up of our P6 facility and the construction of our P7 facility.

63.     The statements in the July 11, 2005 press release referenced above were materially false and/or misleading for the reasons set forth in ¶¶ 14 and 41.

64.     On July 22, 2005, LG filed a Prospectus with the SEC on a Form 424B4 in connection with its 2005 Secondary Offering of approximately $1.5 billion. A concurrent offering of approximately 2.375 million shares of common stock was to take place in Korea as well. The Prospectus made numerous representations concerning LG's cost competitiveness, stating, in relevant part, as follows:

> We believe that our technology leadership enables us to make timely investments in advanced manufacturing facilities and process technology migrations and improvements, which in turn positions us to deliver a

broad and advanced product portfolio in high volumes and in a cost competitive manner to our customers.

*      *      *

The advanced nature and scale of our facilities is a key driver of our cost competitiveness.

*      *      *

We plan to continue focusing on our product and manufacturing technology in order to maintain our position as an industry leader in delivering a broad and advanced product portfolio in high volumes and in a cost competitive manner.

65.     The Prospectus also listed risks concerning LG's industry, including that:

We operate in a highly competitive environment and we may not be able to sustain our current market position.

*      *      *

Our industry is subject to cyclical fluctuations, including recurring periods of capacity increases, that may adversely affect our operating results.

*      *      *

Our operating results fluctuate from period to period, so you should not rely on period-to-period comparisons to predict our future performance.

66.     The statements in the 2005 Secondary Offering Prospectus referenced above were materially false and/or misleading for the reasons set forth in ¶¶ 14 and 41.

67.     On October 11, 2005, the Company announced via press release its third quarter 2005 results, reporting its unaudited earnings results based on consolidated Korean GAAP for the three-month period ended September 30, 2005.  Concerning growing demand and pricing, the press release stated, in relevant part, that:

Third quarter 2005 sales were led by the growing demand for large and wide LCD TV panels and a stronger pricing environment for notebook panels.

68.     Commenting on the Company's performance and growth, defendant Koo, stated,

19

in relevant part, as follows:

> During the third quarter, we further enhanced our product portfolio, consistently reduced our square meter costs and continued on our path of market leadership.  As we predicted, large and wide LCD TVs are becoming mainstream, and we are driving this growth through our cutting-edge products, manufacturing excellence and innovative partnerships.

69.   Concerning LG's third quarter financial review, the press release stated, in relevant part, that:

> Revenue in the three-month period ended September 30, 2005 increased by 46% to KRW 2,741 billion (USD 2,630 million) from KRW 1,875 billion (USD 1,799 million) in the corresponding period in 2004, as increases in shipments were robust due to growing TV demand and a stabilizing pricing environment.

70.   Commenting on LG's performance and outlook, defendant Wirahadiraksa stated, in relevant part, that:

> In the third quarter, we experienced increased demand, especially in the LCD TV and notebook panel segments, and, as a result, we shipped a record amount of display area, despite a strong competitive environment. We were able to meet this demand growth due in large part to the successful ramp up of our P6 facility, which achieved its initial design capacity of 90,000 sheets per month this quarter.  While we continued to increase capacity, we were also intensely focused on cost reduction, which continued to show improvement.
>
> *          *          *
>
> For the fourth quarter of 2005, we anticipate our area shipments will increase by a low teens percentage quarter-on-quarter due to continued growth, especially in the rapidly expanding TV segment.  We expect our average selling price per square meter of net display area shipped at the end of the fourth quarter of 2005 to be flat to slightly down, as compared to the end of the third quarter of 2005, largely due to potentially weaker pricing for some monitors.  Our EBITDA margin for the fourth quarter is expected to be in the mid-to-high twenties.

71.   The statements in the October 11, 2005 press release referenced above were materially false and/or misleading for the reasons set forth in ¶¶ 14 and 41.

72.     On November 14, 2005, the Company announced via press release that it began to order equipment necessary for the second phase of mass production at P7 and stated, in part, that "the Company decided to order equipment for the second phase of mass production at P7 due to the rapid growth in the LCD TV market and to meet the needs of its global customer base."

73.     The statements in the November 14, 2005 press release referenced above were materially false and/or misleading for reasons set forth in ¶¶ 14 and 41.

74.     On January 12, 2006, the Company announced via press release its fourth quarter 2005 results, reporting its unaudited earnings results based on consolidated Korean GAAP for the three-month period ended December 31, 2005.  The press release stated, in relevant part, as follows:

> Fourth quarter sales were led by the continued growth in demand for large and wide LCD TV and notebook panels, which softened the impact of a challenging monitor demand environment.

75.     Commenting on LG's performance and strong consumer demand, defendant Koo stated, in relevant part, as follows:

> During the fourth quarter, LCD TV panel demand was strong as consumers are rapidly recognizing LCD technology as "the" flat TV technology of choice.
>
> *       *       *
>
> The strong holiday selling season, we have entered an era of healthy HDTV set demand growth, well timed with the January ramp up of our Generation 7 fab, 'P7.'  Thus, we are well positioned to retain our leadership role in this dynamic industry.

76.     Concerning LG's fourth quarter financial review, the press release stated, in relevant part, as follows:

> Revenue in the three-month period ended December 31, 2005 increased by 53% to KRW 2,963 billion (USD 2,934 million) from KRW 1,933 billion (USD 1,914 million) in the corresponding period in 2004, due to

continued growth in TV and notebook sales.

77.     Commenting on the Company's performance, defendant Wirahadiraksa, stated, in

relevant part, as follows:

> Our financial performance in the fourth quarter reflects the consistent
> approach we have taken to managing our business. We continue to enjoy
> unit and area demand growth, especially in the LCD TV and notebook
> segments, and are leveraging our extensive portfolio of production
> facilities to meet the dynamic needs of our customers. We are committed
> to providing the market with innovative and top quality TFT-LCD panels.
> Our shipment growth this quarter was slightly lower than expected due to
> a production shift in our existing facilities to support our strategy of
> growing the demand of large size TVs, particularly, 42" panels, in advance
> of the P7 ramp-up. This facilitated our sooner than expected P7 ramp up
> in the first week of January 2006. We anticipate sequential shipment
> growth in the first quarter of 2006, despite historical industry seasonality.

78.     The statements in the January 12, 2006 press release referenced above were

materially false and/or misleading for the reasons set forth in ¶¶ 14 and 41.

79.     On March 21, 2006, LG announced via press release an update to its first quarter

business outlook for 2006.    Commenting on LG's expected performance, defendant

Wirahadiraksa, stated, in relevant part, as follows:

> During the first quarter of 2006, the industry is witnessing a faster than
> expected ASP decline in all product segments. Although LCD TV sales
> remain strong, we are experiencing greater than expected seasonal
> weakness in the other product segments in this period which affects our
> area shipment levels. Despite these factors, we were able to generate a
> better than expected cost down in our fabs. In fact, given the strong
> performance of our newest fab, P7, we now anticipate reporting a better
> EBITDA performance for the first quarter of 2006. We are particularly
> pleased with this, given the quarter's weaker pricing environment.

80.     The statements in the March 21, 2006 press release were materially false and/or

misleading for the reasons set forth above in ¶¶ 14 and 41.

81.     On April 11, 2006, LG announced via press release its first quarter 2006 results,

reporting its unaudited earnings results based on consolidated Korean GAAP for the three-month

period ended March 31, 2006.  The press release stated, in relevant part, as follows:

> The sequential decline in sales in this year's first quarter was the result of a greater than expected decline in demand and the average selling price in both the notebook and monitor panel segments.

82.     Commenting on LG's performance, defendant Wirahadiraksa, stated, in relevant

part, as follows:

> Our EBITDA margin was better than expected, boosted by the operational efficiencies from the launch of P7.

*          *          *

> An important element in our strategy to drive growth is our commitment to cost reduction, which includes process innovation and raw material cost reduction efforts.

83.     The statements in the April 11, 2006 press release referenced above were

materially false and misleading for the reasons set forth above in ¶¶ 14 and 41.

84.     Defendants purportedly had already significantly unwound their price-fixing

activities by this time.  Even prior to the first quarter 2006 results being reported, the Defendants

knew that the second quarter 2006, third quarter 2006 and fourth quarter 2006 results would

include losses totaling in excess of half a billion dollars.  Without the scheme in place, LG's

near-term financial prospects had weakened.  Over the next few weeks, the Company's shares on

the KSE declined from approximately 41,050 (Won) to approximately under 30,000, while LG's

ADSs on the NYSE fell from approximately $22 per share to approximately $15 per share.

85.     On June 12, 2006, LG announced via press release an update to its outlook for the

second quarter of 2006.  Commenting on the Company's outlook, defendant Wirahadiraksa

stated, in relevant part, as follows:

> Several factors affected the global LCD industry during the second quarter.  First, the industry experienced larger than expected price declines across all product categories.

\*       \*       \*

> Given these factors, we have decided to temporize production to address
> inventory concerns and better balance our short term supply with demand.
> Furthermore, we are reviewing our total capacity plans for the year and
> beyond.

86.    The statements in the June 12, 2006 press release above were materially false

and/or misleading for the reasons set forth in ¶¶ 14 and 41.

87.    On July 11, 2006, LG announced via press release its second quarter 2006 results,

reporting its unaudited earnings results based on consolidated Korean GAAP for the three-month

period ended June 30, 2006.  The press release stated, in relevant part, as follows:

> The sequential decline in sales was the result of an industry-wide decline
> in average selling prices across the TV, monitor and notebook segments,
> as well as less than expected sales volume growth and overcapacity.

88.    Commenting on the Company's performance, defendant Koo, stated, in relevant

part, as follows:

> The second quarter was a difficult quarter for the Company, as we were
> significantly impacted by much greater than expected industry-wide
> pricing weakness.  As we look closely at our business and the long-term
> growth prospects for the TFT-LCD industry, we remain committed to
> building sustainable value for shareholders and customers by balancing
> long-term growth strategies with shorter-term actions designed to
> maximize operating profits.

89.    Commenting on the Company's performance, defendant Wirahadiraksa, stated, in

relevant part, as follows:

> We are disappointed with our financial performance in the second quarter
> of 2006.  As a result, the Company is now taking initiatives to address the
> issues that are affecting our business.  As we announced in June, we are
> addressing an increase in inventory levels during a period of overcapacity,
> primarily in the LCD TV segment, by temporizing production.  We will
> continue to control inventory levels going forward.

> We believe that the temporization of production, along with other efforts,

will enable us to maintain our competitiveness as a top-tier player in an industry that is starting to take a more rational approach to capacity and has undiminished long-term growth prospects. While some of the measures are immediate, we generally expect they will strengthen our shareholders' long-term value and will enable us to leverage the industry's strong growth opportunities as we closely examine all areas of our manufacturing, capital expenditures, customer relations and expense management. We are confident LG Philips LCD's business results and prospects will improve over the course of 2006.

90.     The statements in the July 11, 2006 press release referenced above were materially false and/or misleading for the reasons set forth in ¶¶14 and 41.

91.     LG's profitability fell into a decline after the Defendants began to abandon the scheme which inflated LG's profits.

92.     On October 10, 2006, LG announced via press release its third quarter 2006 results, reporting unaudited earnings results based on consolidated Korean GAAP for the three-month period ended September 30, 2006. The press release reported an operating loss of $404 million and a net income loss of $339 million for the third quarter of 2006. Commenting on LG's performance, defendant Koo, stated, in relevant part, as follows:

During the third quarter, our business did not perform at the level we expected, primarily due to higher than anticipated price declines mainly for LCD TVs. As such, the Company continues to take the necessary steps to correct the issues that have limited our progress in recent quarters. Our ability to effectively reduce costs and improve efficiencies will be crucial in restoring profitability as we prepare for what we believe will be a difficult first half of 2007. We have made some inroads in these areas, and will take more substantial steps going forward

93.     Commenting on the Company's performance, defendant Wirahadiraksa stated, in relevant part, as follows:

We are now at a crucial inflection point. Without additional measures relating to product mix, cost and productivity, we will not be able to deliver value to our shareholders. In the coming months, LG Philips LCD will take the required actions in these areas to better respond to a new reality on pricing, demand and competitive pressures. We are confident

that we have at least taken the right first steps - maintaining healthier inventory levels, reducing costs at an expedited rate in Q3, and aligning ourselves in a more substantial way with our customers – and management remains committed to do what is necessary to generate acceptable returns.

94.     The statements in the October 10, 2006 press release referenced above were materially false and/or misleading for the reasons set forth in ¶¶ 14 and 41.

95.     On December 8, 2006, officials from the KFTC raided LG's Seoul headquarters. LG's units in Tokyo, Japan and San Jose, California were investigated as well.

96.     On December 11, 2006, LG formally announced via press release that it was being investigated for possible anticompetitive conduct in the LCD industry. News of the KFTC's raid and the other investigations caused a multi-day stock decline. LG's shares on the KSE fell from 27,000 on December 11, 2006 to 25,550 on December 13, 2006, which represented an approximate 50% decline from the highs reached during the earlier stage of the Class Period in May and June 2005, when LG traded at over 50,000. LG's shares on the NYSE fell from $15.23 per ADS on December 7, 2006 to a close of $14.06 per ADS on December 12, 2006, which represented a nearly 50% decline from the high of $26.60 reached earlier in the Class Period on June 7, 2005.

97.     The importance of the December 11, 2006 announcement and the message the market understood, was that the Company's strong performance over the past several years might not have been the result of the Company's actual business, but rather a deceptive scheme and course of conduct to fix prices and control the LCD's industry supply and demand which resulted in inflated revenues and profit margins.

98.     On or around December 12, 2006, LG, Samsung Electronics and Sharp Corporation denied their involvement in an LCD price fixing scheme, notwithstanding the investigation. On December 12, 2006, news sources, including AFP News, reported that "[b]oth

Samsung and LG Philips deny they have been involved in any price rigging." An official of LG Philips stated to ETNEWS, in a Korean News article (as translated to English), that ". . . . LG Philips has not done any anti-competitive activities, therefore, it shall fully cooperate with the investigation of the authorities . . . ." Ms. Cho Sung In, a spokeswoman of Samsung Electronics, told reporters that "Samsung is strongly committed to fair competition and ethical practices and forbids anticompetitive behavior." A spokeswoman of Sharp Corporation, Ms. Miyuki Nakayama, stated that the company was surprised to have received the summons and added that Sharp has a policy of "fair and ethical management."

99.     On January 16, 2007, the Company announced via press release its fourth quarter 2006 financial results, reporting unaudited earnings results based on consolidated Korean GAAP for the three-month period ended December 31, 2006.

100.    Commenting on the Company's performance, defendant Wirahadiraksa, stated, in relevant part, as follows:

> We are encouraged by our performance this quarter and the results of the enhanced cost reduction initiatives we are implementing. During the fourth quarter, we were able to reduce our COGS per square meter in KRW by 10% sequentially. In addition, we maintained finished goods inventory levels at slightly under three weeks at the end of the quarter. Further, the increasing number of long-term supply agreements we have secured, reflects our continued focus on closer customer collaboration as we head into a challenging market environment in 2007.

101.    Concerning LG's strategy and prospects, defendant Wirahadiraksa stated, in relevant part, as follows:

> Responding to the needs of our customers and a rapidly evolving global business environment remains a key focus of LG.Philips LCD. We believe our strategy is strong and that the new leadership team, announced in late December, will further enhance the Company's global standing and business capabilities.

102.    On April 10, 2007, the Company announced via press release its first quarter 2007

financial results, reporting unaudited earnings results based on consolidated Korean GAAP for

the three-month period ended March 31, 2007.   Concerning the Company's performance,

defendant Soo Kwon stated, in relevant part, as follows:

> During the first quarter, our sales performance was encouraging, particularly in the TV and notebook PC segments, as the supply/demand environment improved and pricing began to stabilize.   While we are pleased with these results, we continue to direct our resources on a number of key areas that we believe will bring about long-term shareholder value creation.
>
> First, our efforts to better collaborate with our customers continue to pay off, as exemplified by major customers ranking us among their top suppliers.   Second, our continued focus on intensive cost reduction resulted in a sequential 9% decrease in cost of goods sold on a square meter basis.   Third, our finished goods inventory levels came in at approximately two weeks at the end of the quarter.   Lastly, our approach to CAPEX has made certain that investments specifically correspond with market demand.
>
> While the first quarter presented many of the same industry-wide challenges that have been affecting the Company for the past several quarters, there are a few recent trends that are now positively impacting the industry: consumers are demanding LCDs over plasma display panels due to superior technology at comparative pricing in the 40" TV segment; and the industry is taking a more conservative and realistic approach to production and capital spending.   We expect that going forward these dynamics will bring further strength to the market and are indicative of an industry turnaround in the very near future.

103.   On April 11, 2007, LG filed its 20F annual report with the SEC.   Concerning the

DOJ investigation and fallout, the 20F report stated, in relevant part, as follows:

> In December 2006, we received notice that we were under investigation by the Korean Fair Trade Commission, the Japanese Fair Trade Commission, the Antitrust Division of the U.S. Department of Justice and regulatory bodies of other competitive markets with respect to possible anti-competitive activities in the TFT-LCD industry.   We are cooperating fully with the investigations, which remain preliminary.
>
> Subsequent to the commencement of the U.S. Department of Justice investigation, a number of purported class action lawsuits were filed against us and other TFT-LCD panel manufacturers in various federal

district courts, alleging violation of U.S. antitrust laws and other related laws. In addition, purported class action lawsuits have been brought against us, and certain of our officers and directors, in the United States District Court for the Southern District of New York in 2007, alleging, among other things, that we and certain of our officers and directors violated the U.S. Securities Exchange Act of 1934, or the Exchange Act, in connection with possible anti-competitive activities in the TFT-LCD industry. While we intend to defend these suits vigorously, it is too early in the proceedings to evaluate the probability of a favorable or unfavorable outcome of the actions, or to estimate the potential loss, if any.

104.    On July 10, 2007, the Company announced via press release its second quarter 2007 financial results, reporting unaudited earnings results based on consolidated Korean GAAP for the three-month period ended June 30, 2007. Defendant Soo Kwon, stated, in relevant part, the following:

> Our second quarter's performance was better than expected, which underscored a faster than anticipated turnaround. This was driven in large part by the successful implementation of our strategies aimed at reducing costs, sustaining a disciplined CAPEX strategy, maintaining healthy inventory levels and developing plans for capacity expansion, especially at P7. Overall, we benefited from the market's more rational production and pricing levels and believe LG.Philips LCD is well positioned for continued performance improvement in the second half of 2007.
>
> In the second quarter, enhanced customer collaboration and overall strong market demand were the primary drivers of improved shipment levels in the monitor and notebook segments. We were pleased to see that shipments for the TV segment also increased in the second quarter, with ASP declines stabilizing to levels better than those projected in previous guidance. Innovative cost reduction initiatives resulted in the sequential decrease in cost of goods sold per square meter of 12% and we are well on our way to achieving around 30% in cost reductions for 2007.

105.    On October 9, 2007, LG filed its third quarter 2007 financial results, reporting unaudited earnings results based on consolidated Korean GAAP for the three-month period ended September 30, 2007. Defendant Soo Kwon, stated, in relevant part, as follows:

> We are pleased with our financial performance this quarter, underscored by better than expected profit levels. These strong results reflect our focus on value based management including our continued diligence on

29

reducing costs, maintaining a disciplined CAPEX strategy, developing marketing initiatives focused on our customer base, and managing appropriate inventory levels given both the current and projected market demand. Additionally, better than anticipated cost savings this quarter of 9 percent in terms of USD came as a result of our product development effort and effectively managing the supply chain. We are well on our way to achieving this year's guided cost reduction of approximately 30 percent.

*      *      *

In conclusion, our current strategic decisions produced constructive results in the third quarter and attest that we are progressing in the right direction and well positioned to retain our role as a disciplined leader in this dynamic industry.

106.    On January 14, 2008, LG filed its fourth quarter 2007 financial results, reporting unaudited earnings results based on consolidated Korean GAAP for the three-month period ended December 31, 2007.    Concerning LG's performance, defendant Soo Kwon, stated, in relevant part, as follows:

We are delighted with our outstanding performance last quarter and throughout 2007, which was driven by strong global demand and stabilized ASP. In addition, we have continuously focused on cost savings and were able to achieve our planned reduction in COGS per square meter in USD of 2% (3% in KRW) during the fourth quarter. On an annualized basis, we exceeded our projected cost reduction in COGS per square meter in USD of 25%, reporting a very strong 31% annual reduction. Further, our commitment to achieve sustainable growth by staying close to our customers, investing in technology leadership and process innovation also contributed to the strong results. These accomplishments are the result of the hard work by our team members across all levels of the organization.

The fourth quarter was marked by several important strategic initiatives. As part of our ongoing efforts to enhance our customer relationships, during the quarter we opened a module plant in Guangzhou, our second such module site in China. Our strategy of building locally situated module plants allows us to better serve our customers and in this case, specifically in the rapidly emerging Chinese LCD TV market. Additionally, during the quarter we announced a strategic alliance with Taiwan's HannStar Display Corp. that links LPL's acquisition of preferred shares with a commitment to purchase high quality LCD panels from HannStar. We believe these two initiatives are good examples of the innovative steps LPL has historically taken to bind and secure our

relationships with important customers and suppliers in an increasingly competitive and dynamic marketplace.

We are proud of the significant improvements we have made throughout 2007. Going forward, we aim to deliver more predictable and stable growth for the mid-to-long term, which we expect will translate into greater shareholder value.

107.   On April 10, 2008, the Company announced via press release its first quarter 2008 financial results, reporting unaudited earnings results based on consolidated Korean GAAP for the three-month period ended March 31, 2008. Concerning LG's commitment to integrity and growth strategy, defendant Soo Kwon, stated, in relevant part, as follows:

Last quarter was a notable quarter for us. Our performance was encouraging despite the seasonally slow market condition. In addition, we have changed our corporate name from "LG.Philips LCD Co., Ltd." to "LG Display Co., Ltd." and transit into a single Representative Director's organization at the Annual General Meeting according to the change in corporate governance following the reduction of Philips' equity. The new name reflects our intention to expand our business scope and diversify the business model for sustainable growth in the future. While there were changes in our corporate governance, we remain committed to maintain our integrity, being transparent and consistent, accompanied by our competent Directors in the Board.

As part of our ongoing efforts to enhance our strength and to successfully implement a profitable growth strategy in this dynamic industry, we have been seeking various possibilities for forming strategic alliances, which are gradually bearing fruits. . . . Going forward, we remain committed to achieve sustainable growth by emphasizing collaboration with our customers and investing in technology leadership, ultimately generating greater shareholder value.

108.   On April 16, 2008, LG filed its 20F annual report with the SEC. Concerning the DOJ investigation, the 20-F report provided no further information to investors and stated, in relevant part, as follows:

In December 2006, we received notice that we were under investigation by the Korean Fair Trade Commission, the Japanese Fair Trade Commission, the Antitrust Division of the U.S. Department of Justice, the European Commission and regulatory bodies of other competitive markets with

respect to possible anti-competitive activities in the TFT-LCD industry. We are cooperating fully with the investigations, which are ongoing.

Subsequent to the commencement of the U.S. Department of Justice investigation, a number of purported class action lawsuits were filed against us and other TFT-LCD panel manufacturers in various federal district courts, alleging violation of U.S. antitrust laws and other related laws. In addition, purported class action lawsuits have been brought against us, and certain of our officers and directors, in the United States District Court for the Southern District of New York in February 2007, alleging, among other things, that we and certain of our officers and directors violated the U.S. Securities Exchange Act of 1934, or the Exchange Act, in connection with possible anti-competitive activities in the TFT-LCD industry. While we intend to defend these suits vigorously, it is too early in the proceedings to evaluate the probability of a favorable or unfavorable outcome of the actions, or to estimate the potential loss, if any.

109.    On or around May 16, 2008, in a series of articles and press reports regarding the status of the antitrust investigations and potential fines against the Company, LG denied that the Company was receiving substantial criminal fines in Europe and overseas for its illegal LCD price-fixing activities.    Those denials and misleading statements proved to be false as the Company would later acknowledge its own illegal price-fixing practices and receipt of a substantial criminal fine for its role in the scheme.    Specifically, the Company's denials appeared in, among other places, EDAILY, NEWSPIM, YNA, and in statements, as reported, that were made to H.J. Lee, an analyst with Mirae Assets Securities Co. Ltd.

110.    On July 9, 2008, the Company announced via press release its second quarter 2008 financial results, reporting unaudited earnings results based on consolidated Korean GAAP for the three-month period ending June 30, 2008.    Concerning LG's business structure and competitive advantages, Defendant Soo Kwon stated, in relevant part, as follows:

Our record-setting operating profit in this year's second quarter came from our constant efforts toward overall reform of our business structure. We will develop sustainable competitive advantages and continue to foster

close relationships with our customers, offering them superior technology and reliable quality.

111.    On October 14, 2008, the Company announced via press release its third quarter 2008 financial results, reporting unaudited earnings results based on consolidated Korean GAAP for the three-month period ending September 30, 2008.  Concerning LG's business structure and cost competitiveness, defendant Soo Kwon stated, in relevant part, as follows:

> Although the market environment and our operating results have been favorable since last year, we continued to stay alert and pressed on with efforts toward overall reform of our business structure.  That has made us more resilient to market fluctuations.  On the strong business structure, we are continuing to reinforce our cost competitiveness and prepare to turn the current challenges into opportunity.

112.    Statements issued by the Defendants (in ¶¶ 96-111) after the announced raid by the KFTC of LG's headquarters on or about December 8, 2006 and through November 12, 2008, when LG pled guilty to the price-fixing scheme and received a massive $400 million criminal fine, were materially false and/or misleading.  Defendants misled investors worldwide by touting its financial strength, business structure, competitive advantages and strategic initiatives, while continuing to conceal and deny its participation in the illegal price-fixing scheme and failing to disclose the strong likelihood that LG and a number of its senior executives would be forced to plead guilty to an antitrust conspiracy which allowed it to inflate its profits and share price, and which ultimately would result in the payment of a historic criminal fine.

113.    On November 12, 2008, the DOJ filed a charge of information against the Company and its wholly-owned subsidiary, LG Display America, in the U.S. District Court for the Northern District of California, alleging that the Company participated in a combination and conspiracy in the United States and elsewhere to suppress and eliminate competition by fixing the prices of LCD panels between September 21, 2001 and June 1, 2006, in violation of 15

U.S.C. §1.   The DOJ charged that, for the purpose of forming and carrying out the charged combination and conspiracy, LG and its co-conspirators did, among other things, the following: (a) participated in meeting, conversations, and communications in Taiwan, Korea and the United States to discuss the prices of TFT-LCD; (b) agreed, during those meetings, conversations, and communications, to charge prices of TFT-LCD at certain pre-determined levels; (c) issue price quotations in accordance with agreements reached; and (d) exchange information on sales of TFT-LCD, for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

114.   On November 12, 2008, the DOJ also announced that LG and its subsidiary, LG Display America, had agreed to plead guilty and to pay $400 million in fines for the Company's role in the price-fixing of LCD panels.

115.   In early 2009, several LG employees pled guilty to or were indicted for participating in the conspiracy, including: Chang Suk "C.S." Chung, an executive from LG Display; Bock Kwon, an executive from LG Display; and Duk Mo Koo, a former Executive Vice President and Chief Sales Officer from LG Display.

116.   Chang Suk "C.S." Chung, pleaded guilty to participating in the conspiracy to fix the prices of LCD Panels sold worldwide, including the United States, from September 2001 through June 2006.   Specifically, Mr. Chung admitted that he participated in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, agreed to fix the prices of LCD Panels at certain predetermined levels, issued price quotations in accordance with the agreements reached, exchanged pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices, and authorized, ordered, and consented to the participation of subordinate employees in the conspiracy.   In connection with his guilty plea, Mr. Chung has agreed to serve a 7-month prison

term and pay a criminal fine of $25,000.

117.    Bock Kwon, an executive from LG Display, also pleaded guilty to participating in the conspiracy to fix the prices of LCD Panels sold worldwide, including the United States, from September 2001 through June 2006.  Specifically, Mr. Kwon admitted that he participated in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, agreed to fix the prices of LCD Panels at certain predetermined levels, issued price quotations in accordance with the agreements reached, exchanged pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices, and authorized, ordered, and consented to the participation of subordinate employees in the conspiracy.  In connection with his guilty plea, Mr. Kwon has agreed to serve a 12-month prison term and pay a criminal fine of $30,000.

118.    Duk Mo Koo, former Executive Vice President and Chief Sales Officer from LG Display, has been indicted for participating in the conspiracy to fix the price of LCD Panels sold worldwide, including the United States, from December 2001 through December 2005. Specifically, Mr. Koo has been charged with participating in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, including the Crystal Meetings that took place in Taiwan.  Mr. Koo has also been charged with agreeing to fix the prices of LCD Panels at certain predetermined levels, issuing price quotations in accordance with the agreements reached, exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices, authorizing, ordering, and consenting to the participation of subordinate employees in the conspiracy, accepting payment for the supply of LCD Panels sold at collusive, noncompetitive prices to customers in the United States, and taking steps to conceal the conspiracy and his

conspiratorial contacts.

119.   Due to the Company's continued materially false and misleading statements through the November 12, 2008 DOJ announcement, the Company's securities had been inflated on the KSE and NYSE.  LG stock on the KSE closed at 22,600 on November 12, 2008 and declined 11.06% to a close of 20,100 on November 13, 2008.  On November 12, 2008, LG ADSs on the NYSE closed at $7.45, falling from the previous day's close of $7.94.

## DEFENDANTS' MISLEADING FINANCIAL REPORTING DURING THE CLASS PERIOD

120.   Defendants caused LG to falsely report its financial results during the Class Period through its illegal and collusive dealings with other companies in violation of U.S. law, thereby inflating the price of the Company's securities trading on the KSE and NYSE.

121.   During the Class Period, LG's fiscal results were included in filings with the SEC, including those on Forms 6-K and 20-F.  LG's results were also included in several press releases the Company had issued during the Class Period.

122.   The Company's financial statements were materially false and/or misleading because they reported inflated revenues, earnings and income as a result of Defendants' scheme and for the reasons set forth in ¶¶ 14, 41 and 112.  LG's financial statements did not fairly present the Company's financial results in accordance with, and in violation of, GAAP and SEC rules.

123.   GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosures.  Regulation S-X also provides

that "[t]he information required with respect to any statement shall be furnished as a minimum requirement to which shall be added such further material information as is necessary to make the required statements, in the light of the circumstances under which they are made, not misleading." 17 C.F.R. §210.4-01(a). Interim financial statements must also comply with GAAP and include disclosures sufficient to ensure that the interim financial information is not misleading. 17 C.F.R. §210.10-01(a).

124.   LG presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)      Financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit, and similar decisions (FASB Statement of Concepts No. 1, ¶ 34);

(c)      Financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, ¶ 40);

(d)      Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluation of past enterprise performance (FASB Statement of Concepts No. 1, ¶ 42);

(e)      Financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of

enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶ 50);

      (f)      Financial reporting should clearly represent what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶ 58-59);

      (g)      Financial reporting must be complete in that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶ 79);

      (h)      The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶ 95, 97).

125.    The undisclosed adverse information concealed by Defendants during the Class Period is the type of information which, because of SEC regulations, GAAP, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed.  Corporate officials and their legal and financial advisors know this to be the type of information that is expected to be and must be disclosed.

## LOSS CAUSATION / ECONOMIC LOSS

126.    During the Class Period, the Defendants engaged in a course of conduct that artificially inflated the price of the Company's securities and operated as fraud or deceit on purchasers of the Company's securities during the Class Period. The Defendants misrepresented and concealed material information from the public concerning the anticompetitive conduct

engaged in by LG to fix LCD prices at artificially inflated levels and that this scheme would spur investigations by regulators ultimately leading to a guilty plea by LG and a staggering criminal fine.

127.    The Defendants' misstatements and omissions caused and maintained artificial inflation in the price of the Company's securities traded on the KSE and NYSE throughout the Class Period and until the truth was slowly revealed to the market.   As Defendants' prior misrepresentations and omissions were disclosed and became apparent to the market throughout the Class Period, the price of the Company's securities fell precipitously as the prior artificial inflation came out of the Company's securities trading on the KSE and NYSE.  Defendants falsely defrauded public investors by denying LG's involvement in LCD price fixing and its potential exposure to a substantial criminal fine until November 12, 2008.  The Company's materially false and misleading statements were the proximate cause of its stock decline. Throughout the Class Period, the Defendants' materially false and misleading statements and representations had the intended effect and caused the Company's stock price on both the KSE and NYSE to trade at artificially inflated levels.  During the Class Period, LG's stock traded as high as 58,700 and $31.29 on the KSE and NYSE, respectively.  Due to their Class Period purchases of the Company's securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss, that is, damages under the federal securities laws.

## SCIENTER ALLEGATIONS

128.    Defendants acted with *scienter* in that they knew or recklessly disregarded that the public documents and statements, issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and

substantially participated or acquiesced in the issuance and/or dissemination of such statements or documents in primary violation of the federal securities laws.

129.   As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding LG and the likelihood of being compelled to plead guilty and be subjected to a massive fine, their control over and/or receipt and/or modification of LG's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning LG, participated in the fraudulent scheme alleged herein.

130.   Because of their executive and managerial positions with LG, the Individual Defendants had access to the adverse non-public information about the business affairs of LG particularized herein *via* access to internal corporate documents, conversations or connections with corporate officers or employees, attendance at management and Board of Directors' meetings thereof and/or via reports and other information provided to them in connection therewith.

131.   Defendants had a duty to promptly disseminate accurate and truthful information with respect to LG's business affairs and likelihood of exposure to a massive fine, or to cause and direct that such information be disseminated and to promptly correct any previously disseminated information that was misleading to the market.  As a result of their failure to do so, the price of LG's securities on both the KSE and NYSE was artificially inflated during the Class Period, damaging Plaintiffs and the Class.

132.   Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described in this Complaint could not have been perpetuated over a

substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

133.   Each defendant is liable as a primary violator of the securities laws in making false and misleading statements, and for participating in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of LG's securities on both the KSE and NYSE during the Class Period.

134.   The Individual Defendants, because of their positions with LG, controlled the contents of the quarterly reports, annual reports and press releases disseminated throughout the Class Period.   Each Individual Defendant was provided with or had access to copies of the reports and press releases alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were false and misleading.   As a result, each of the Individual Defendants is responsible for the accuracy of LG's press releases detailed herein and is, therefore, responsible and liable for the representations contained therein.

135.   Defendants engaged in the conduct herein in order to successfully complete several offerings during the Class Period on terms otherwise unobtainable but for the Defendants' fraudulent conduct.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
**FRAUD ON THE MARKET**

136.   Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that: (a) the Defendants made public material misrepresentations or failed

to disclose material facts; (b) the Company's securities traded in efficient markets; (c) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities trading on both the KSE and NYSE; and (d) the Plaintiffs and other members of the Class purchased the Company's securities between the time the Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

137.    The market for LG's securities was open, well-developed and efficient at all relevant times.  The Company's securities trading on the KSE and NYSE met the requirements for listing and were listed and actively traded on both the KSE and NYSE, both highly efficient and automated markets.  The Company filed periodic reports with the SEC, KSE and NYSE and regularly communicated with investors, and was followed by analysts.

138.    Because of the materially false and misleading statements and failures to disclose, set forth above, LG's securities traded at artificially inflated prices during the Class Period.

139.    Plaintiffs and other members of the Class purchased or otherwise acquired LG's securities relying upon the integrity of the market price of LG's securities and market information relating to LG, and have been damaged thereby.

140.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of LG's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  These statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business affairs, involvement in a price-fixing scheme and ultimate regulatory exposure.

141.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class.

142.    As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about LG.    These material misstatements and omissions had the cause and effect of creating in the market concerning LG thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.

143.    Defendants' materially false and misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

144.    The market for the Company's securities on both the KSE and NYSE promptly digested current information regarding the Company and reflected such information in the Company's share price.    All purchasers of the Company's securities during the Class Period suffered similar injury through their purchase of the Company's securities at artificially inflated prices and the subsequent revelations concerning declines in price, and a presumption of reliance applies.

## CLASS ACTION ALLEGATIONS

145.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class (the "Class") consisting of all persons and entities who purchased or otherwise acquired LG's securities during the Class Period on the KSE. Excluded are Defendants, any entity in which Defendants have a controlling interest or is a parent or subsidiary of or is controlled by the Company, and the officers, directors, employees,

affiliates, legal representatives, heirs, predecessors, successors and assigns of Defendants.

146.   The members of the Class are so numerous that joinder of all members is impracticable.   LG's securities actively traded on both the KSE and NYSE during the Class Period.   While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are thousands of members of the Class.

147.   Questions of law and fact are common to all members of the Class and predominate over any questions affecting solely individual members of the Class.   Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)   whether the Company issued materially false and misleading financial statements via press release, filing with the SEC and conference calls concerning LG's business affairs and likelihood of exposure to a massive criminal fine, during the Class Period;

(c)   whether Defendants acted knowingly or recklessly in issuing materially false and misleading statements;

(d)   whether the market prices of the Company's securities on the KSE during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

(e)   whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

148.   Plaintiffs' claims are typical of the claims of the members of the Class as

Plaintiffs and the other members of the Class each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

149.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

150.   A class action is superior to other available methods for the fair and efficient adjudication of the controversy because joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs done to them.  Plaintiffs anticipate no unusual difficulties in the management of this action as a class action.

## NO STATUTORY SAFE HARBOR

151.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Complaint because none of the statements pleaded herein are "forward-looking" statements nor were they identified as "forward-looking statements" when made.  No meaningful cautionary statements identified important factors that could cause actual results to differ materially from those in any purportedly forward looking-statements.

152.   In the alternative, to the extent that the statutory safe harbor does apply to any statements pleaded herein that are deemed to be forward-looking, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the speaker knew those forward-looking statements were false and/or the statement was authorized and/or approved by an executive officer of LG who knew that the statements were false when

made.

## COUNT I

### (VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 BROUGHT AGAINST ALL DEFENDANTS)

153.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

154.    During the Class Period, Defendants directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiffs and the other members of the Class, and made various deceptive and untrue statements of material facts and omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiffs and the other members of the Class.  The purpose and effect of the scheme, plan, and unlawful course of conduct was, among other things, to deceive the investing public, including Plaintiffs and the other members of the Class, and to induce Plaintiffs and the other members of the Class to purchase LG's securities during the Class Period at artificially inflated prices.

155.    During the Class Period, Defendants, pursuant to said scheme, plan, and unlawful course of conduct, knowingly and/or recklessly issued, caused to be issued deceptive and materially false and misleading statements to the investing public as particularized above.

156.    Because of Defendants' dissemination of and/or failure to correct the false and misleading statements set forth above, the market price of LG's securities was artificially inflated during the Class Period.  Unaware of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by Defendants, Plaintiffs and the other members of the Class who purchased LG's securities on the open market,

relied, to their detriment, on the integrity of the market price of the stock in purchasing LG's securities.

157.   Had Plaintiffs and the other members of the Class known the truth, they would not have purchased LG's securities or would not have purchased them at the inflated prices paid.

158.   Plaintiffs and the other members of the Class have suffered damages as a result of the wrongs herein alleged in an amount to be proven at trial.

159.   By reason the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and the other members of the Class for damages that they suffered in connection with their purchases of LG securities during the Class Period.

## COUNT II

## VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT
## BROUGHT AGAINST THE INDIVIDUAL DEFEDANTS

160.   Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

161.   The Individual Defendants are liable as direct participants in the wrongs complained of herein.

162.   Because they signed the SEC filings and/or because of the positions they held in LG management, the Individual Defendants directly participated in the day-to-day operations of the Company and were privy to confidential proprietary information concerning LG, its business affairs and likelihood of receiving a massive criminal fine.

163.   The Individual Defendants are responsible for LG's public filings and press releases, and are provided with copies of LG's public filings and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to

prevent their issuance or cause them to be corrected.

164.    The Individual Defendants are responsible for the accuracy of the public filings and press releases detailed herein, and are therefore primarily liable for the representations contained therein.

165.    By reason of their management positions and ability to make public statements on behalf of LG, the Individual Defendants were and are controlling persons, and had the power and influence to cause and did cause LG to engage in the unlawful conduct complained of herein.

166.    The Individual Defendants acted as controlling persons of the Company within the meaning of section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level as officers and/or directors of the Company, and active participation in and/or awareness of the Company's day-to-day operations, and/or intimate knowledge of the Company's business plans and implementation thereof, each Individual Defendant had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs allege are false and misleading.  The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings and other statements alleged herein to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

167.    The Individual Defendants had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

168.    By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

169.    As a direct and proximate result of the wrongful conduct of the Individual

Defendants, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs, on behalf of themselves the Class, pray for judgment as follows:

(a)     Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b)     Awarding Plaintiffs and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

(c)     Awarding Plaintiffs and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

(d)     Such other relief as this Court deems appropriate.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:  June 2, 2010

By: _____
     Richard A. Speirs

ZWERLING, SCHACHTER & ZWERLING, LLP
Jeffrey C. Zwerling
Richard A. Speirs
Paul Kleidman
41 Madison Avenue
New York, NY  10010
Tel.: (212) 223-3900
Fax: (212) 371-5969
Email: jzwerling@zsz.com
          rspeirs@zsz.com
          pkleidman@zsz.com

WE THE PEOPLE LAW GROUP
YoungKi Rhee
Member of the State Bar of Arizona
9F Sunil Bldg.
21-2 Pil dong 1-Ka, Chung-Ku
Seoul, South Korea
Tel: 82-2-2285-0062
Fax: 82-2-2285-0071
Email: ykrhee@wethepeople.co.kr

*Attorneys for Plaintiffs*

## <u>EUN-JA SON CERTIFICATION</u>

I, Eun-Ja Son, declare that the following is true and correct to the best of my knowledge, information and belief:

1.      I have reviewed the complaint regarding LG Display Co., Ltd (f/k/a LG Philips LCD Co., Ltd., ("LG") and have authorized Lee International IP & Law Group ("Lee") and Zwerling, Schachter & Zwerling LLP ("ZSZ") to file it on my behalf.  I have retained Lee and ZSZ to represent me in connection therewith and in related litigation in connection with the securities that are set forth in this certification.

2.      I did not purchase or acquire the security that is the subject of this action at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.      I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      My transactions in the security that is the subject of this action during the class period are as follows:

| Date | Transaction (Purchase or Sale) | #Shares | Price (Korean Won) |
|------|-------------------------------|---------|--------------------|
| 2007/11/05 | Purchase | 500 | 25,050,000 |
| 2007/11/05 | Purchase | 500 | 25,650,000 |
| 2008/03/05 | Sale | 1,000 | 44,700,000 |

5.      During the three years preceding the date of this certification, I have not sought to serve or served as a representative party on behalf of a class.

6.      I will not accept any payment for serving as a representative party on behalf of a class, except beyond my *pro rata* share of any recovery or as ordered or approved by the Court, including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I, Eun-Ja Son, certify that the foregoing is true and correct.

Dated: May 17, 2010                                    _____

                                                                          Eun-Ja Son

## SANG-IK HAN CERTIFICATION

I, Sang-Ik Han, declare that the following is true and correct to the best of my knowledge, information and belief:

1.     I have reviewed the complaint regarding LG Display Co., Ltd (f/k/a LG Philips LCD Co., Ltd., ("LG") and have authorized Lee International IP & Law Group ("Lee") and Zwerling, Schachter & Zwerling LLP ("ZSZ") to file it on my behalf.  I have retained Lee and ZSZ to represent me in connection therewith and in related litigation in connection with the securities that are set forth in this certification.

2.     I did not purchase or acquire the security that is the subject of this action at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.     I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     My transactions in the security that is the subject of this action during the class period are as follows:

| Date | Transaction (Purchase or Sale) | #Shares | Price (Korean Won) |
|------|-------------------------------|---------|--------------------|
| 2008/05/26 | Purchase | 50 | 2,220,000 |

5.     During the three years preceding the date of this certification, I have not sought to serve or served as a representative party on behalf of a class.

6.     I will not accept any payment for serving as a representative party on behalf of a class, except beyond my *pro rata* share of any recovery or as ordered or approved by the Court, including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I, Sang-Ik Han, certify that the foregoing is true and correct.

Dated:  May _18_, 2010                         _____
                                                             Sang-Ik Han